**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Nov 23, 2020

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BULLSEYE ENERGY, LLC, | ) | **Case No. 20-11144-R** |
| | ) | **Chapter 11** |
| Debtor-in-Possession. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court is the Motion to Dismiss or in the Alternative to Abstain (Doc. 60) ("Motion") filed by Anthis Land Company, LLC ("Anthis") and James Miller ("Mr. Miller") (collectively "Movants"); the objection (Doc. 96) of Debtor Bullseye Energy, LLC ("Debtor"); and the response (Doc. 102) in support of Debtor's objection filed by Robert M. Kane, Louise Kane Roark, Ann Kane Seidman, Mark Kane, KRS&K, and Bullseye Operating, LLC ("Bullseye Operating") (collectively, the "Kane Parties"). A hearing on the Motion was originally set for October 23, 2020, which was within 30 days of the filing of the Motion, as mandated by 11 U.S.C. § 1112(b)(3).   Upon the request and consent of the parties, the hearing was continued to and held on October 26 and 27, 2020, whereupon the Court took the matter under advisement. On November 10, 2020, in compliance with 11 U.S.C. § 1112(b)(3), which required to Court to "decide the motion [to dismiss] not later than 15 days after commencement of [the] hearing" on such motion, the Court entered its Order Denying Motion to Dismiss or in the Alternative to Abstain (Doc. 110).

Upon consideration of the testimony and documentary evidence admitted at the hearing, the arguments of counsel, the record in this Chapter 11 case, and applicable law, the Court finds and concludes as follows:

I.      **Jurisdiction**

The Court has jurisdiction of this contested matter pursuant to 28 U.S.C. § 1334, §§ 157(a) and (b)(1), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

II.     **Contentions of the parties**

Movants are royalty owners under oil and gas leases granted to Debtor. In 2012, Mr. Miller and certain other royalty owners sued Debtor and other entities in the United States District Court for allegedly underpaying royalties owed under their leases. This litigation, commenced as a class action, has proceeded by fits and starts as parties and claims have been added and eliminated, lawyers have come and gone, and settlement negotiations and the process of seeking approval of a settlement stayed the proceedings. In 2020, eight years after the lawsuit was filed, Mr. Miller and his co-plaintiffs were poised to conduct discovery and request certification of a class or classes of royalty owners. Debtor filed its petition seeking relief under Chapter 11 of the Bankruptcy Code on July 11, 2020 ("Petition Date"), two days before depositions were to commence in the District Court litigation.

Movants contend that this Chapter 11 case should be dismissed under 11 U.S.C. § 1112(b)[1] as a bad faith filing. Specifically, Movants argue that Debtor has no ongoing business to reorganize and invoked the protection of the bankruptcy stay solely to obstruct

-----

[1] Unless otherwise indicated, all statutory references made herein are to sections of Title 11 of the United States Code.

2

discovery and class certification in the District Court litigation. In the alternative, Movants

request dismissal or suspension of this bankruptcy case under Section 305(a)(1) to allow

the District Court litigation to proceed.

Debtor denies that it filed in bad faith, arguing that its financial condition has

deteriorated over a period of years as a result of low commodity prices, declining well

production, and the expense of defending itself in the District Court litigation. Debtor

contends that the purpose of its Chapter 11 filing is a legitimate one -- to preserve and

operate its remaining assets, maximize their value for the benefit of creditors, wind down

its business in an orderly fashion, and obtain a discharge.

## III.    Findings of fact

Robert M. Kane is the designated representative for Debtor in this bankruptcy case.

He acts as president/manager of Debtor, a limited liability company. Mr. Kane and three

siblings (collectively the "Kane Siblings") each own a 25% interest in Debtor.[2]

Mr. Miller is one of eight named plaintiffs ("Named Plaintiffs"), and Debtor is one

of fifteen defendants,[3] in a lawsuit captioned Kevin L. Jeter, et al. v. Wild West Gas, LLC,

et al., Case No. 12-CV-411-TCK-CDL (consolidated with Case No. 15-CV-455-TCK-

CDL), pending before Judge Terence C. Kern in the United States District Court of the

---

[2]   Until 2017, an unrelated entity, CEP Midcontinent LLC, owned a 50% interest in
Debtor.

[3]   Some of the fifteen defendants have been dismissed from the District Court Case.

Northern District of Oklahoma ("District Court Case").[4]  The case was brought in 2012 as a class action, but as of the Petition Date, no class had been certified. Movants contend that they are potential class representatives if a class or classes are certified. The crux of the dispute in the District Court Case is whether Debtor, as lessee, properly calculated and paid royalties to Movants and other lessors according to their particular leases and applicable law.

At the hearing on the Movants' motion to dismiss or abstain, the parties introduced extensive evidence, expert opinions, and legal arguments related to the merits of the claims asserted against Debtor in the District Court Case. The Court heard conflicting testimony regarding, among other things, interpretation of the royalty clauses in the various types of leases; the appropriate base on which royalties should be calculated; the point at which extracted gas becomes marketable; whether it is relevant to the calculation of royalties that the entities that purchased, gathered, transported, and resold the gas were related to Debtor; and whether disclosures on royalty check stubs were sufficient. It appears that resolution of these issues will require the application of arguably unsettled Oklahoma law. In considering the Motion, however, the Court considers this evidence solely for the purpose of understanding the scope and status of the District Court Case and the issues that may be before this Court if claims filed herein are contested. Nothing in this order shall be

---

[4] Movant Anthis is not a Named Plaintiff in the District Court Case.

4

construed as findings of fact or conclusions of law on the merits of any of the above-contested issues or claims.

The dispute over royalty payments arose when Mr. Miller, who leased land to Debtor for purpose of exploring for and extracting oil and gas,[5] noticed that the detail on his royalty check stubs indicated that the price of gas on which his 3/16 royalty was calculated appeared to be significantly lower than the published price of gas that was recognized as standard in the region. Thus, in 2012, Mr. Miller and other Named Plaintiffs, as individuals and as representatives on behalf of a class of similarly-situated persons, filed their original Complaint in District Court against Debtor, Wild West Gas, LLC ("Wild West") (an affiliate of Debtor, and owner and operator of the local gas gathering system to which Named Plaintiffs' wells were connected), KRS&K (a general partnership comprised of the Kane Siblings), and two other entities that have been dismissed from the case.[6] Named Plaintiffs contend that Debtor underpaid royalties by improperly deducting production charges (*i.e.*, charges for marketing, gathering, compressing, dehydrating, processing and/or transporting gas from the wells) from gross proceeds realized at the point the gas entered interstate pipelines, and using the net proceeds figure as the base upon which the royalty owners' percentage of proceeds was derived. Claiming various breaches of contract and implied duties under Oklahoma law, as well as fraud, Named Plaintiffs

---

[5] See Movants' Exhibit 22.

[6] Debtor's Exhibit 104.

5

sought the certification of a class and appointment of class representatives, compensation for underpayment of royalties to Named Plaintiffs, and compensation for underpayment to members of the putative class, costs, prejudgment interest, punitive damages, and an accounting.[7]

In 2015, the Named Plaintiffs, joined by a few more royalty owners, amended their original Complaint to assert additional claims against Debtor and KRS&K, and to add more defendants, including CEP Midcontinent, LLC ("CEP") (which, until 2017, owned a 50% interest in Debtor), the Kane Siblings, and two employees (collectively, "Defendants"). Named Plaintiffs charged Defendants with a conspiracy to commit mail fraud under the Racketeer Influenced and Corrupt Organizations Act ("RICO").[8] In mid-2016, Debtor, joined by the other Defendants, filed a comprehensive Motion for Summary Judgment,[9] which Debtor believed would dispose of most if not all of the claims, and Named Plaintiffs filed their motion for class certification. Debtor and the other Defendants filed an extensive objection to class certification on September 2, 2016.[10]

On September 15, 2016, all parties to the District Court Case submitted an Agreed Joint Motion for Temporary Stay of Proceedings and Setting of Settlement Conference,

---

[7] Id.

[8] See Debtor's Exhibit 105.

[9] Id.

[10] Debtor's Exhibit 106.

which was granted.[11]  As a result, the scheduling deadlines governing the case, including response and reply deadlines for the Defendants' Motion for Summary Judgment and the motion for class certification, were stricken. A settlement conference was held on November 15, 2016.[12]

In April 2017, two of the Named Plaintiffs ("Settling Plaintiffs") reached a settlement with all Defendants.[13]  The settlement consisted of a cash payment of $700,000, from which attorney fees and expenses, class representative payments, and class administration expenses would be paid, with the remainder distributed to class members.[14] The Settling Plaintiffs also agreed to a formula for calculating the price upon which royalties would be paid by Debtor going forward, which was presented as conferring substantial additional value to class members.[15]  In exchange, the class would release all claims against all Defendants.

On September 29, 2017, Settling Plaintiffs filed a Joint Motion for Preliminary Approval of Settlement Agreement with Defendant Bullseye Energy Inc., *et al*., for Certification of a Settlement Class, and for Approval of Notice of Settlement and Plan of

---

[11] Debtor's Exhibit 107.

[12] See Debtor's Exhibit 108.

[13] See Debtor's Exhibit 109.

[14] See Debtor's Exhibits 110 and 111.

[15] Id.

Notice.[16] The District Court preliminarily approved the settlement on March 21, 2018.[17] The non-settling Named Plaintiffs, led by Mr. Miller, and 72 other royalty owners, objected to the settlement as not fair, reasonable, or adequate, and objected to the adequacy of prior counsel's representation.[18]

On June 27, 2019, the District Court appointed new interim class counsel,[19] and on July 22, 2019, the District Court entered its Opinion and Order denying final approval of the settlement.[20] In doing so, the District Court concluded that the settlement was not fair, reasonable or adequate because it failed to "distinguish between gross and net royalty owners" and would over-compensate net royalty owners and under-compensate those with gross leases.[21] The District Court further concluded that "questions of law and fact [related to class certification and a lessee's duties to royalty owners] are not so insurmountable that Plaintiffs are likely to lose on the merits of their claims."[22] The District Court also found that the net proceeds to be paid to class members was insufficient, and "although Defendant Bullseye has threatened to file for bankruptcy if the case continues, 14 other Defendants

---

[16] See Debtor's Exhibit 111.

[17] Id.

[18] See Debtor's Exhibit 110 and 111.

[19] See Debtor's Exhibit 112.

[20] Debtor's Exhibit 111.

[21] Debtor's Exhibit 111 at 4. It appears that Anthis is a "net royalty owner" with respect to at least one lease. See Debtor's Exhibit 131.

[22] Debtor's Exhibit 111 at 6.

remain in the case, and no admissible evidence concerning their economic condition has been introduced. Therefore, the Court is not convinced that the value of an immediate recovery outweighs the possibility of future relief."[23]

On October 22, 2019, an Agreed Scheduling Order was entered in the revived District Court Case which, among other things, set May 14, 2020, as the deadline for Named Plaintiffs to file their class certification motion "with supporting evidence, including expert disclosures."[24] Although the discovery deadline was July 17, 2020, discovery requests made after May 14, 2020, were limited to addressing new matters raised in the class certification pleadings.[25] Accordingly, all discovery required for filing a class certification motion had to be completed before May 14, 2020. Nothing substantive occurred in the litigation between October 22, 2019, and May 2020, however.[26] Named Plaintiffs did not seek any third-party discovery through subpoenas or depositions.

On May 6, 2020, another Agreed Amended Scheduling Order[27] was entered which continued the class certification motion deadline from May 14, 2020, to July 22, 2020. On July 2, 2020, Named Plaintiffs issued a rash of subpoenas for the production of documents,

---

[23] Id. at 6-7.

[24] Debtor's Exhibit 113 at 2.

[25] Id. at 2 n.1.

[26] Mr. Miller testified that unproductive settlement discussions occurred during that time.

[27] Movants' Exhibit 16.

and for the appearance of representatives of Signature Measurement, LLC ("Signature Measurement"), Wild West, White Hawk Gas, Inc. ("White Hawk") (another gas gathering system affiliated with Debtor), and Debtor's accountant.[28] The first deposition was to be held on Monday, July 13, 2020, pursuant to a subpoena to Signature Measurement, an entity specializing in gas measurement and revenue distribution that had allocated gas proceeds between Debtor and royalty owners and prepared the royalty checks and check stubs.[29] Other depositions were set for later that week. At that point, with active litigation recommencing, Mr. Kane determined that Debtor lacked adequate funds or sources of income to pay for its defense and, accordingly, authorized the filing of this Chapter 11 case. The petition for relief was filed on July 11, 2020, two days before the deposition of a representative of Signature Measurement was to occur.

Debtor's financial condition has been in a free fall for years as a result of historically low oil and gas prices, declining production, the cost of pulling and plugging wells, and the expense of the District Court Case. Mr. Kane testified that Debtor incurred and paid about $980,000 to lawyers and other professionals in defending the litigation. On many occasions since 2015, Mr. Kane advised Named Plaintiffs and their counsel, the settlement

---

[28] See Movants' Exhibits 11-15.

[29] Signature Measurement's owner/manager, Paul Morris, testified at the hearing on the Movants' Motion. The company calculated payments due to royalty owners and the working interest owner, *i.e.*, Debtor, on behalf of White Hawk and Wild West who allegedly purchased the gas at the wellhead.

judge, and Judge Kern, as well as outside vendors, that Debtor was on the brink of bankruptcy. For example, in July 2017, Mr. Kane, as president of Debtor, executed an affidavit in the District Court Case stating—

> Since the inception of this case, I have considered the very real possibility that Bullseye Energy would have to declare bankruptcy if Plaintiffs herein obtained a judgment against Bullseye Energy in any amount near what Plaintiffs are seeking in this case. That possibility has become much more of a probability, given the downturn in prices for natural gas and the continued low prices for such gas.

> I have reviewed the current financial documents for Bullseye Energy, and if Plaintiffs obtained a judgment against Bullseye Energy in the amount being sought by Plaintiffs, Bullseye Energy would not be able to fund such judgment and would be forced to file for bankruptcy.[30]

In 2016, Debtor stopped paying its affiliate, Bullseye Operating, for its services. Bullseye Operating's proof of claim states Debtor owes in excess of $585,000 for "Outstanding Joint Interest Invoices (Expense Reimbursement - Labor, Materials, Supplies, etc.)."[31] KRS&K (the Kane Siblings' partnership) filed a proof of claim in the amount of $50,000, characterized as money loaned to Debtor.[32]

---

[30] Debtor's Exhibit 115 at 2.

[31] Debtor's Exhibit 129 at 2. The proof of claim reflects unpaid invoices from January 2016 through July 2020.

[32] Claim No. 15 filed herein on September 27, 2020.

Debtor's tax returns reflect ordinary income losses of $140,135 in 2018 and $205,370 in 2019.[33] In November 2019 and May 2020, Debtor sold its interests in approximately 400 leases to an unrelated party[34] for $20 and the purchaser's assumption of operating and plugging liability on those properties. The transfers were disclosed in Debtor's schedules.[35] The buyer also purchased the gas gathering systems – Wild West and White Hawk – that serviced those wells, and took over operations of the wells from Bullseye Operating. Debtor retained approximately 15 to 20 producing wells in its portfolio, which are the principal source of Debtor's income.[36] Debtor also retained some leases that are currently shut in but have the potential to produce gas in the future.

In its bankruptcy schedules, Debtor lists 581 royalty owners ("Royalty Owners") as having contingent, unliquidated, and disputed claims against Debtor. Each of the Royalty Owners has been given notice of this bankruptcy and the bar date for filing claims. Thus far, 24 Royalty Owners have filed claims. The bar date for filing claims has been extended to December 15, 2020.

---

[33] See Debtor's Exhibit 128. Mr. Kane testified that 2014 was the last year that Debtor did not suffer losses.

[34] Although the November 2019 sale and the May 2020 sale appear to be to different parties, Mr. Kane testified that the first purchaser was an agent of the second purchaser, and thus all the transferred properties are owned and controlled by a single party.

[35] See Movants' Exhibit 4 at 4-4, and 4-9 through 4-13.

[36] It appears that these wells generate gross income of approximately $10,000 to $12,000 per month.   See Movants' Exhibits 5-10.

12

At the hearing on the Motion, the Court heard testimony concerning Debtor's potential liability to a possible class or classes of Royalty Owners. Movants' expert concluded that Debtor's total underpayment liability exceeded $4,000,000.[37] Debtor's expert concluded that royalties were properly paid and perhaps overpaid in some instances.

## IV.   Conclusions of law

A.   <u>Dismissal under Section 1112(b)(1)</u>

Section 1112(b)(1) of the Bankruptcy Code states, in relevant part –

> Except as provided in paragraph (2) . . . , on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.[38]

The movant has the burden of establishing cause for dismissal by a preponderance of the evidence.[39] Lack of good faith in filing a Chapter 11 case is cause for dismissal under Section 1112(b)(1).[40] When Chapter 11 relief is sought for an improper purpose, *i.e.*, to unreasonably deter, hinder or harass creditors, rather than to achieve the legitimate objectives of Chapter 11, *i.e.*, to preserve a business as a going concern or to maximize the

---

[37] At a previous hearing, the Court heard testimony that the estimated liability, including statutory interest through the Petition Date, was in excess of $12,000,000.

[38] 11 U.S.C. § 1112(b)(1) (emphasis added).

[39] <u>See</u> <u>In re Hyatt</u>, 479 B.R. 880, 886 (Bankr. D. N.M. 2012).

[40] <u>See</u> <u>In re Muskogee Environmental Conservation Co.</u>, 236 B.R. 57, 66 (Bankr. N.D. Okla. 1999) (hereinafter "MECCO"), and cases cited therein.

value of the estate for the benefit of creditors,[41] a court may conclude that a Chapter 11 case was filed in bad faith.[42] Courts have compiled lists of "factors" to consider in evaluating whether a case was filed in bad faith,[43] but ultimately a court must look at the factual circumstances in the particular case to determine whether the debtor's motivation to file under Chapter 11 was consistent with the policies and purposes of the Bankruptcy Code.[44]

---

[41] See Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999) ("the two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors").

[42] See In re Marshall, 298 B.R. 670, 683 (Bankr. C.D. Cal 2003), aff'd 403 B.R. 668 (C.D. Cal. 2009). See also In re Sullivan, 522 B.R. 604, 617 (B.A.P. 9th Cir. 2014) ("Good faith is lacking only when the debtor's actions are a clear abuse of the bankruptcy process") (quotation marks and citation omitted).

[43] See, e.g., In re Nursery Land Development, Inc., 91 F.3d 1414, 1416 (10th Cir. 1996); In re Forest Hill Funeral Home & Memorial Park, 364 B.R. 808, 820 (Bankr. E.D. Okla. 2007); MECCO, 236 B.R. at 66. The so-called factors employed in these cases include: (1) debtor has only one asset; (2) debtor engaged in improper prepetition conduct; (3) debtor has few unsecured creditors; (4) debtor was unsuccessful in defending foreclosure; (5) debtor was unable to post bond after loss; (6) bankruptcy allows debtor to evade court orders; (7) debtor has no ongoing business or employees; and (8) no possibility of reorganization. Id. These factors appear relevant where a debtor files for protection under Chapter 11 to stall an inevitable foreclosure in a single-asset real estate case (as was the case in Nursery Land Development), but this Court does not find the factors particularly helpful in other contexts. Other courts create different collections of "factors" to fit the circumstances in particular cases, see, e.g., In re Fox, 232 B.R. 229, 232 (Bankr. D. Kan. 1999) (timing of the petition, motive of debtor, and accuracy of the schedules), but the ultimate hallmark of a bad faith Chapter 11 filing is a debtor that has no legitimate need for Chapter 11 relief.

[44] For instance, in MECCO, the bankruptcy court dismissed the debtors' Chapter 11 case not because the debtors filed the case in bad faith or sought to abuse the bankruptcy process, but because intervening events (the reversal of the state court judgment that

14

As evidence of bad faith, Movants argue that (1) Debtor filed bankruptcy as a litigation tactic to (a) thwart discovery in the District Court Case, and specifically to preclude discovery Movants sought from Signature Measurement, (b) deprive Royalty Owners of the opportunity to obtain a determination of their claims as members of a class in District Court, and (c) protect non-debtor insiders who are co-defendants in the District Court Case; (2) Debtor divested most of its assets prior to the Petition Date, and thus has no ongoing business, no employees, and no possibility of reorganization; and (3) Debtor has only a few undisputed unsecured creditors, and those creditors are insiders.[45]

     *1.*    *Motivation*

With respect to timing of the filing, it is undisputed that Debtor had been contemplating bankruptcy for several years, citing the cost of the litigation and the economic collapse of the oil and gas industry generally. Dating back to 2015, Debtor began alerting parties, vendors, and judicial officials that the cost of litigation may render it insolvent and force it into bankruptcy. Debtor attempted to avoid bankruptcy by negotiating a settlement of the District Court Case in 2016-17, but the settlement was not approved.

---

necessitated the filing in the first place, and the remand of the dispute to the trial court) negated the "need of or use for the bankruptcy court." MECCO, 236 B.R. at 68. Debtors in MECCO had appropriately employed the bankruptcy process for several years to protect its ongoing successful business from garnishments and interference by judgment creditors, and in fact, debtors had proposed a plan of reorganization before the state court judgment was reversed. The facts, rather than the factors, established that debtors no longer needed bankruptcy protection.

[45] See Motion at 31.

Debtor believed it could resolve some or all claims against it on summary judgment. But the deadlines for responding to Debtor's motion were stayed during settlement negotiations. Named Plaintiffs never responded to the legal arguments set forth in the motion. After the settlement was rejected in 2019, the motion was summarily denied without prejudice at moot.[46]

The District Court Case then lay dormant for almost a year. During that time, Debtor began winding down its unprofitable business by transferring 80% of its leases to a party that agreed to assume plugging liability. Debtor filed bankruptcy only when extensive discovery was propounded and deadlines for briefing on the certification of a class approached. Rather than incurring legal and expert fees necessary to participate in depositions, litigate the certification issue, and defend the claims on the merits, Debtor succumbed to the circumstances and sought refuge in Chapter 11.[47] Taking advantage of the automatic stay "cannot by itself support a finding of bad faith."[48] Eliminating the crushing weight of ongoing litigation expenses is a legitimate use of Chapter 11.

---

[46] See Minute Order entered in the District Court Case on December 9, 2019, Doc. 336.

[47] Although Debtor's members have loaned or contributed money to Debtor to fund the litigation up until now, and Debtor's affiliates had provided services and materials without compensation or reimbursement since 2016, Debtor has no enforceable right to their continued largesse.

[48] Fox, 232 B.R. at 235.

Movants claim that Debtor consistently ignored and rebuffed their attempts to obtain documents and testimony from Signature Measurement, and characterize the bankruptcy filing as yet another attempt to obstruct such discovery.[49] The Court finds no compelling evidence that this case was filed to withhold information from Named Plaintiffs.   At the hearing on Movants' Motion, Debtor called Signature Measurement's manager, Paul Morris, as a witness. Mr. Morris testified that he had produced thousands of documents to Named Plaintiffs' counsel on a CD in 2016, and made boxes of other documents available at his office.[50] Movants' counsel questioned Mr. Morris extensively about Signature Measurement's historical role in calculating the disputed royalty payments, issuing the royalty checks, and preparing the check stubs that Movants contend are misleading. Mr. Morris testified that he was never asked to hide or withhold information from Named Plaintiffs, and that he fully intended to attend and testify at the deposition in July 2020.

_____

[49] "Movants submit that this bankruptcy case was filed specifically to avoid [Signature Measurement's] deposition and document production. In fact, that would be the first time in the District Court Litigation that Robert Kane could not control the document production or testimony given in the case." Motion at 9.

[50] Mr. Morris testified that in 2016, Signature Measurement produced and/or made available to Named Plaintiffs' counsel thousands of documents responsive to a subpoena, notwithstanding that it filed, jointly with Debtor, a motion to quash and for protective order as to allegedly overbroad and unduly burdensome document requests contained therein. See Debtor's Exhibit 117. In April 2017, the District Court denied the motion to quash and for protective order as moot when settlement of the case was announced. See Minute Order entered in District Court Case on April 17, 2017, Doc. 235. The Court rejects Movants' contention that the filing of the motion to quash and the filing of the bankruptcy petition constitute a pattern of willfully obstructing Movants from obtaining discovery from Signature Measurement.

17

The Court concludes that Debtor's predominant motivation in filing its Chapter 11 petition was to stop incurring legal fees and expenses in the District Court Case, rather than a litigation tactic to "thwart discovery"[51] as Movants contend.

Movants also assert that Debtor filed bankruptcy in order to prevent certification of a class or classes. This Court will not try to guess whether a class or classes of Royalty Owners can or will be certified. But based on the testimony of credible experts on both sides of the issue, litigation over certification will likely be lengthy, hotly contested, and expensive. Debtor's motivation to avoid this expense does not smack of bad faith.

Movants also claim Debtor filed bankruptcy in order to protect non-debtor insiders who are co-defendants in the District Court Case. However, Movants did not establish that the District Court Case cannot go forward against non-debtor insider co-defendants.

### 2.    *Possibility of reorganization*

Movants argue that because Debtor transferred most of its leases prior to filing bankruptcy, "Debtor has no ongoing business and has no employees,"[52] and therefore nothing to reorganize. Debtor still owns some producing oil wells that are generating

---

[51] Motion at 29.

[52] Motion at 30. Mr. Kane testified that Debtor has never had any employees. Instead, Debtor retains Bullseye Operating on a contractual basis. Bullseye Operating's employees execute all facets of Debtor's production and operations, and invoices Debtor for those services and materials. That arrangement is not unusual in the energy sector, and the fact that a Chapter 11 debtor uses its prepetition contractor rather than employees to carry on its business is not a badge of bad faith. See, e.g., In re MV Pipeline Co., 2007 WL 1452591 at *13 (Bankr. E.D. Okla.).

income, however, as well as some shut-in gas wells that could be reworked if gas prices increase to render production economically feasible. It also owns equipment scheduled with a value of $219,000.[53] Mr. Kane testified that Debtor seeks to maximize value of its remaining assets in Chapter 11, first by ceasing to accrue litigation expenses in the District Court Case, and then by proposing a plan based on maintaining its current oil production and hopefully selling its leases and other assets when the market is more advantageous.[54]

The Court cannot say, at this point, that it is objectively futile for Debtor's downsized business to propose and confirm a plan. The extent of Debtor's success in Chapter 11 will depend on various economic factors, mostly outside of Debtor's control, but if Debtor is relieved of the cost and burden of litigating in the District Court, it is not impossible to envision that Debtor's efforts might result in some recovery to creditors. Mr. Kane testified

---

[53] See Debtor's Exhibit 120 at 4, 17-20.

[54] The Bankruptcy Code authorizes liquidating plans. See 11 U.S.C. § 1123(b)(4). Seeking relief from the pressure of litigation in order to wind down operations and liquidate assets in an orderly fashion is not contrary to fundamental bankruptcy policies. See, e.g., In re East End Development, LLC, 491 B.R. 633, 642 (Bankr. E.D.N.Y. 2013) ("intent to liquidate assets in an orderly process is not evidence of bad faith"); In re Hyatt, 479 B.R. 880, 895 (Bankr. D. N.M. 2012) ("Giving debtors the opportunity to reorganize in response to impending financial distress is the purpose of chapter 11. The fact that this financial distress was brought on by litigation rather than borrowing is not dispositive.") (quotation marks and citations omitted); In re Melendez Concrete Inc., 2009 WL 2997920 at *4 (Bankr. D. N.M.) (debtor's intent to liquidate its operating assets in an orderly fashion rather than surrendering them to the secured lender for auction did not demonstrate bad faith; an orderly sales process provided the "best prospect" for maximizing value for the benefit of unsecured creditors); In re First Assured Warranty Corp., 383 B.R. 502, 544 (Bankr. D. Colo. 2008) (although it had no ongoing business to rehabilitate, debtor's filing of Chapter 11 to achieve an orderly liquidation was not in bad faith).

that if this Chapter 11 case is dismissed, Debtor will simply shut down its business and dissolve.

> 3. *Few creditors*

Movants argue that Debtor has no need for a Chapter 11 reorganization, and therefore filed in bad faith, because its only undisputed creditors are insiders or affiliates over whom Debtor has control, and who are not pressing Debtor for payment. This argument fails because Debtor identified 581 unaffiliated persons or entities that are asserting or may assert claims against Debtor and its estate. Debtor is attempting to address all claimants, disputed and undisputed, in a single forum and in an efficient and expedited manner.

The Court concludes Movants have not shown that Debtor filed this Chapter 11 case in bad faith. Mr. Kane, on behalf of Debtor, credibly articulated legitimate bankruptcy objectives it seeks to achieve — avoiding the dissipation of Debtor's estate in the District Court litigation, preserving its downsized business as a going concern to maximize the value of its remaining leases, and eventually converting the value to cash for equitable distribution to creditors.

Accordingly, Movants have not established "cause" for dismissal under Section 1112(b).[55]

---

[55] Because the threshold issue of "cause" has not been established, the Court need not, under Section 1112(b)(2), identify "unusual circumstances" showing that "dismissing

B.      Abstention under Section 305(a)

Section 305(a) of the Bankruptcy Code provides that a court "may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if -- (1) the interests of creditors and the debtor would be better served by such dismissal or suspension."[56] "[G]ranting relief under § 305(a) is an extraordinary remedy, and should be invoked sparingly."[57] "Determining whether to grant such relief is 'more than a simple balancing of harm to the debtor and creditors; rather the interest of both the debtor and its creditors must be served by granting the requested relief.'"[58] The party moving for relief has the burden of establishing the benefit to both debtor and creditors.[59]

Movants argue that the District Court has devoted an enormous amount of time and resources in becoming conversant with the relevant facts, legal issues, and authorities pertinent to the Named Plaintiffs' claims against Debtor. But the District Court Case is not trial-ready by any stretch of the imagination. No motion for class certification has been filed, and although Movants believe that the District Court will eventually certify a class

---

the case is not in the best interests of creditors and the estate" or that "there is a reasonable likelihood that a plan will be confirmed." 11 U.S.C. § 1112(b)(2).

[56] 11 U.S.C. § 305(a)(1).

[57] In re Naartjie Custom Kids, Inc., 534 B.R. 416, 424 (Bankr. D. Utah 2015) (quotation marks and citations omitted). See also In re Sky Country Estates, LLC, 2018 WL 3872109 *3 (Bankr. D. N.M. 2018).

[58] Naartjie, 534 B.R. at 425, quoting In re Monitor Single Lift I, Ltd., 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008).

[59] Id.

or classes, certification is not a foregone conclusion. Importantly, on the merits, Named Plaintiffs have not yet been required to respond to, and the District Court has not yet adjudicated, Debtor's asserted legal bases for judgment in its favor as a matter of law.[60] Pretrial activity in the District Court Case will involve substantial time and resources.

Debtor filed this case as a small business Chapter 11 case. By statute and rule, small business cases such as this one must proceed quickly and efficiently. Royalty Owners have been given notice of this case and have an opportunity to file a claim directly against Debtor. Royalty Owners that have already filed proofs of claim against Debtor expect this Court to adjudicate their claims. Movants do not speak for those Royalty Owners.[61]

Moreover, it cannot be an efficient or economical use of Movants' resources, or judicial resources, to proceed toward trial in the District Court in an effort to obtain a judgment against an insolvent company. Nothing prevents Movants or Named Plaintiffs from pursuing their claims against the other Defendants in the District Court.

---

[60] As stated above, in December 2019, the District Court denied Defendants' Motion for Summary Judgment as moot without prejudice to refiling.

[61] Movants admit that "resolution of the amount of royalty owners['] claims will require a review of leases and all financial transactions related to production reported, charges assessed and basis and documentation therefor[], before a court." Motion at 20 n.15. In other words, in the District Court Case, each Royalty Owner's damages will have to be calculated on an individual basis. Adjudicating these individual claims in District Court will occur only if Named Plaintiffs are successful in certifying a class or classes, and then only if Named Plaintiffs prevail on the merits, a process that could take years. In this Chapter 11 case, each Royalty Owner has been given notice of the bankruptcy case and the opportunity to immediately and directly file its claim against Debtor in this Court.

Finally, Debtor voluntarily filed under Chapter 11 to stop accruing debt for legal and other professional expenses in the District Court Case. Debtor will not be better served if this Court abstains and Debtor is forced to rejoin the fray in the District Court Case. Debtor has a finite pool of assets and intends to operate its limited assets, eventually convert those assets to cash, make distributions equitably and according to priority under the Bankruptcy Code, and obtain a discharge. These benefits are not available to Debtor in the District Court Case.[62] Debtor also believes that the bankruptcy claims process will provide a more efficient and economical resolution of the Royalty Owners' claims against it.

The Court concludes that Movants have not established that either Debtor or its creditors would be better served if this case was dismissed or suspended to allow Named Plaintiffs to proceed against Debtor in the District Court Case.

## V.    Conclusion

For the reasons stated herein, the Motion is denied.

**SO ORDERED** this 23rd day of November, 2020.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

[62] "If dismissal or suspension is not in the interest *of the debtor*, relief under section 305(a)(1) is inappropriate." Sky Country Estates, 2018 WL 3872109 at *4, *quoting* 2 Collier on Bankruptcy ¶ 305.02 (16th ed.) (emphasis added).

23